# In the
# United States Court of Appeals
## for the Eighth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LONNIE JOSEPH PARKER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Arkansas – Texarkana, No. 4:19-cr-40018-SOH-1.
The Honorable Susan O. Hickey, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLANT

RONALD W. CHAPMAN
CHAPMAN LAW GROUP
1441 West Long Lake Road
Suite 310
Troy, MI 48098
(248) 644-6326

*Counsel for Defendant-Appellant*
*Lonnie Joseph Parker*




**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT**

Defendant-Appellant, Lonnie Joseph Parker, M.D., was indicted on nine counts of drug trafficking under 21 U.S.C. §841(a)(1) and (b)(1)(C), with five counts remaining after two superseding indictments. R. Doc. 1, 114. Counts 1, 4, and 5 involved prescribing a Schedule II controlled substance, Oxycodone. *Id*. at 1-3. Count 1 also alleged that the same prescribed controlled substance caused the death of a patient, while Counts 2 and 3 involved prescribing a Schedule V controlled substance, Promethazine HCI. *Id*. Appellant pled not guilty on all counts in the Western District of Arkansas and proceeded to trial. R. Doc. 9, 33-34.

Following an eight-day jury trial, Dr. Parker was found guilty on Counts 1-4 of the unauthorized distribution of a controlled substance. R. Doc. 169-170. He was acquitted on Count 5 and the jury also found that his Oxycodone prescription did *not* cause the death of the patient as alleged in Count 1. *Id*. Dr. Parker was sentenced to 87 months of imprisonment on Counts 1 and 4 and 12 months of imprisonment on Counts 2 and 3. R. Doc. 226.

Appellant now respectfully requests oral argument for 10 minutes to present his argument, pertaining to the government's burden of proof and jury instruction challenges pursuant to *Ruan v. United States*, 597 U.S. 450 (2022).

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ............i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES...............................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE...................................................................3

    A.    The Government's Case-in-Chief .......................................4

    B.    Dr. Parker's Case-in-Chief................................................7

    C.    The Jury Verdict and Sentencing ....................................10

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT ........................................................................................13

    I.    The Evidence is Insufficient to Convict Dr. Parker Because the Government Did Not Prove that he was Drug Trafficking ..........13

        A.    Standard of Review...............................................13

        B.    Every Patient Had a Legitimate Medical Basis for Their Prescriptions ...................................................13

        C.    Drug Trafficking Under Section 841(a) Requires Prescribing for Other Than a Legitimate Medical Purpose ...................................................................18

    II.    The District Court Abused Its Discretion in Giving a Deliberate Ignorance Instruction.........................................19

        A.    Standard of Review...............................................19

        B.    The District Court Did Not Identify A Particular Fact That Dr. Parker Took Deliberate Action to Avoid Learning ...................................................................20

C.     The Deliberate Ignorance Charged Pressed the Jury to Convict Dr. Parker Even if He Was Not Drug Trafficking Controlled Substances ...........................................21

D.     The Improper Deliberate Ignorance Instruction Impacted the Outcome of Trial .................................................23

III.    The District Court Abused Its Discretion Charging the Jury to Convict Dr. Parker Based on a State Standard for Prescribing...........25

A.     Standard of Review...................................................25

B.     Dr. Parker's Initial Motion for New Trial Following the 2022 CDC Prescribing Guidelines...........................................25

C.     Dr. Parker's Subsequent Motion for New Trial Having Retained Post-Trial Counsel ...................................27

D.     The Court Should Review Dr. Parker's Challenge for Abuse of Discretion ...............................................28

E.     The District Court's Instruction to Convict Based on State Prescribing Criteria Undermines *Ruan* and the 2022 CSA .................................................................29

IV.    The District Court Clearly Erred in Calculating Drug Weight Because it Failed to Identify What Portion of "Overprescribed" Prescriptions were Legitimate and Improperly Used "Course of Conduct" to Balloon Drug Weight ......................................................................37

A.     Standard of Review...................................................37

B.     The District Court Found that Dr. Parker Overprescribed Controlled Substances....................................38

C.     The Court Should Remand so that the District Court can Determine what Part of Dr. Parker's Prescriptions were Legitimate.......................................................39

D.     The Court Should Remand Because Dr. Parker was not Convicted of an Offense that Comprises of a Course of Conduct or Scheme ................................................40

CONCLUSION .................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)................................................................1, 11, 20, 21

*Gonzales v. Oregon*,
546 U.S. 243 (2006)................................................................ 2, 32, 33

*In re Winship*,
397 U.S. 358 (1972)................................................................ 24, 36

*Joseph v. United States*,
574 U.S. 1038 (2014)................................................................29

*Ladner v. United States*,
358 U.S. 169 (1958)................................................................18

*Ruan v. United States*,
597 U.S. 450 (2022)................................................................ *passim*

*United States v. Arny*,
137 F. Supp. 3d 981 (E.D. Ky. 2015) ............................................22

*United States v. Barnhart*,
979 F.2d 647 (8th Cir. 1992)................................................................20

*United States v. Behler*,
14 F.3d 1264 (8th Cir. 1994)................................................................37

*United States v. Bieri*,
21 F.3d 811 (8th Cir. 1994)................................................................37

*United States v. Browne*,
89 F.4th 662 (8th Cir. 2023)................................................................2, 39

*United States v. Cardwell*,
71 F.4th 1122 (8th Cir. 2023)................................................................14

*United States v. Dvorak*,
617 F.3d 1017 (8th Cir. 2010)................................................................23

*United States v. Elder*,
682 F.3d 1065 (8th Cir. 2012)................................................................ 14, 18

iv

*United States v. Farish*,
535 F.3d 815 (8th Cir. 2008).......................................................25

*United States v. Feingold*,
454 F.3d 1001 (9th Cir. 2006).....................................................33

*United States v. Hayes*,
518 F.3d 989 (8th Cir. 2008).......................................................25

*United States v. Hayes*,
574 F.3d 460 (8th Cir. 2009).......................................................19

*United States v. Kahn*,
58 F.4th 1308 (10th Cir. 2023)....................................................37

*United States v. King*,
898 F.3d 797 (8th Cir. 2018)............................................. *passim*

*United States v. Listman*,
636 F.3d 425 (8th Cir. 2011).......................................... 1, 22, 23

*United States v. Lussier*,
844 F.3d 1019 (8th Cir. 2017).....................................................13

*United States v. Moore*,
423 U.S. 122 (1975)............................................................ *passim*

*United States v. Regan*,
940 F.2d 1134 (8th Cir. 1991).....................................................23

*United States v. Rosenberg*,
585 F.3d 355 (7th Cir. 2009).......................................................33

*United States v. Sabean*,
885 F.3d 27 (1st Cir. 2018) ........................................................33

*United States v. Simmons*,
964 F.2d 763 (8th Cir.), *cert. denied*, 113 S. Ct. 632 (1992) ........................37

*United States v. Smith*,
573 F.3d 639 (8th Cir. 2009)............................................. *passim*

*United States v. Woodard*,
315 F.3d 1000 (8th Cir. 2003).....................................................19

**Statutes & Other Authorities:**

18 U.S.C. § 3742 ...................................................................................1

21 U.S.C. § 829(e)(2)(A) .......................................................................32

21 U.S.C. § 830(b)(3)(A)(ii) ..................................................................32

21 U.S.C. § 841 .....................................................................................35

21 U.S.C. § 841(a) .........................................................................*passim*

21 U.S.C. § 841(a)(1) .....................................................................*passim*

21 U.S.C. § 841(b)(1)(C) ................................................... 4, 15, 22, 40

21 U.S.C. § 841(b)(1)(E) .......................................................................40

21 U.S.C. § 846 .....................................................................................40

28 U.S.C. § 1291 ....................................................................................1

21 C.F.R. § 1306.04(a) ...................................................................*passim*

Federal Rule of Appellate Procedure 4(b) .............................................1

U.S.S.G. § 6A1.3(a) ..............................................................................37

F. Easterbrook, *The Role of Original Intent in Statutory Construction*,
    11 Harv. J. L. & Pub. Pol'y 59 (1988) .............................................30

Allison Petersen et al., *State Legislative Responses to the Opioid Crisis:
    Leading Examples*, 11 J. HEALTH & LIFE SCI. L. 30 (2018) ...................31

E. M. Stone, et al., *Implementation and Enforcement of State Opioid
    Prescribing Laws*, Drug Alcohol Depend. (Jun. 11, 2020),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC7371528/ ...................................30

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked 28 U.S.C. § 1291, as an appeal from a final judgment of conviction and sentence in the United States District Court for the Western District of Arkansas, Texarkana Division and under 18 U.S.C. § 3742, as an appeal of a sentence imposed under the Sentencing Reform Act of 1984. Notice of appeal was timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

ISSUE ONE: Whether the evidence was sufficient to convict Dr. Parker of drug trafficking under 21 U.S.C. § 841(a) and 21 C.F.R. § 1306.04(a) when he prescribed Oxycodone and Promethazine HCl to patients that medically needed those prescriptions. *Ruan v. United States*, 597 U.S. 450 (2022); *United States v. King,* 898 F.3d 797 (8th Cir. 2018); *United States v. Smith,* 573 F.3d 639 (8th Cir. 2009).

ISSUE TWO: Whether the district court abused its discretion in charging deliberate ignorance despite not conforming to the requirements set forth in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011). Further, whether the district court erred in charging an improper deliberate ignorance instruction, resolving complex prescribing criteria into "right" versus "wrong" and equating addiction and diversion with drug trafficking under 21 U.S.C. § 841(a). *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011); *United States v. Listman*, 636 F.3d 425 (8th Cir. 2011).

ISSUE THREE: Whether the district court abused its discretion when it improperly charged the jury to convict under 21 U.S.C. § 841(a) when Dr. Parker allegedly violated a state standard for prescribing. *Ruan v. United States*, 597 U.S. 450 (2022); *Gonzales v. Oregon*, 546 U.S. 243 (2006); *United States v. Moore*, 423 U.S. 122 (1975).

ISSUE FOUR: Whether the district court clearly erred in calculating drug weight that failed to reflect what portion of Dr. Parker's prescriptions were "overprescribed" under 21 U.S.C. § 841(a), holding Dr. Parker accountable for an unlawful "course of conduct" despite drug trafficking constituting discrete, separate distributions of a controlled substance as opposed to an ongoing or schematic offense. *United States v. Browne*, 89 F.4th 662 (8th Cir. 2023); *United States v. King,* 898 F.3d 797 (8th Cir. 2018).

## INTRODUCTION

Lonnie Joseph Parker, M.D. ("Dr. Paker") was a licensed medical practitioner in Arkansas who held a valid DEA registration to prescribe controlled substances. *See* R. Doc. 114. Dr. Parker treated a spectrum of patients at his clinics, Primary Care Specialist and Modern Medicine, located in Texarkana, Arkansas. T. Tr. Vol 1, at 23, 86. Many of those patients were chronic pain patients requiring opioid medications to manage and treat their intractable pain. *Id.* at 24. Because Texarkana, and Arkansas more generally, suffered from a shortage of physicians, Dr. Parker

stepped in to treat many patients afflicted with addiction but nonetheless suffering from pain. *See id.*[1] He declined to turn these patients away. Dr. Parker grew up near Texarkana on his stepfather's farm. T. Tr. Vol 2, at 856. He has deep ties to the community, and he helped the patients that he could.

## STATEMENT OF THE CASE

Following his service in the Marine Corps, Dr. Parker received his medical degree from the Mayo Clinic Medical School in Rochester, Minnesota. T. Tr. Vol 2, at 859. He practiced as a generalist following his medical training before a mentor of his, Dr. Donald Duncan, steered him toward taking a particular interest in pain. *Id.* at 862-65. Dr. Parker's growing interest in pain led him to seek certification for treating addiction, and with the help of a psychiatrist in Little Rock, he opened a suboxone treatment center on the Arkansas side of Texarkana. *Id.* at 880-81.

Dr. Parker went on to treat pain and addiction patients for decades until in October 2019 the government sought to put an end to that. The DEA obtained and executed a search warrant at Primary Care Specialists on October 8, 2019. T. Tr. Vol 1, at 86-87. Several electronic patient records were seized and the clinic's computers imaged. *Id.* The DEA then retained a Florida physician, Dr. Mark Rubenstein, to review five of the seized patient records. That selection of five files was based on a

---

[1] There are roughly 5,000 patients per physician in the area. T. Tr. Vol 2, at 865.

review of Dr. Parker's Prescription Drug Monitoring Program (PDMP) data. Patients with "a high level of prescribing" were selected for Dr. Rubenstein to review. *Id.*

The government indicted Dr. Parker on nine counts of drug trafficking under 21 U.S.C. § 841(a)(1) and (b)(1)(C). R. Doc. 1. That Indictment was then superseded, twice, and five counts remained. R. Doc. 114. Counts 1, 4 and 5 involved prescribing a Schedule II controlled substance, Oxycodone. *Id.* at 1-3. Count 1 also alleged that the Oxycodone prescription caused the death of Patient N.C. *Id.* Both Counts 2 and 3 involved prescribing a Schedule V controlled substance, Promethazine HCl. *Id.*

Dr. Parker pled not guilty on all counts, and he proceeded to trial in the Western District of Arkansas.

## A. The Government's Case-in-Chief.

The jury trial lasted eight days, over which jurors heard testimony from sixteen witnesses. Among those witnesses were government agents, experts, former patients listed in the indictment, former patients not included in the Indictment, and Dr. Parker himself.

Sheli Chupik, a DEA diversion investigator, testified that opiods are considered narcotics and that they lead to dependence and addiction in patients because they "make the brain feel good." T. Tr. Vol 1, at 40-42. Chupik also

described the Arkansas Medical Practice Act, *Id.* at 44, the Regulations of the Arkansas State Medical Board, *Id.* at 48, and the 2016 Center for Disease Control (CDC) Guidelines for Prescribing Opioids for Chronic Pain (CDC Guidelines). *Id.* at 54. Included in that testimony was Morphine Milligram Equivalents (MMEs), in which Chupik explained that the CDC cautions against prescribing greater than 50 MMEs per day unless there is a specific justified need. *Id.* at 54-56. Chupik also described what she referred to as "pill mills," testifying that a "pill mill" is when a medical office is diverting controlled substances through prescriptions instead of adequately treating patients. *Id.* at 60.

Dr. Rubenstein, a Florida physician, testified on chronic pain and the prescribing of controlled substances, specifically, opioids. He explained that in the early 2000's the CDC published specific guidelines referring to MMEs to assist in prescribing opioids. *Id.* at 629. Dr. Rubenstein testified that:

> And what the CDC tried to do was set guidelines for prescribing in the country and said, This is how much would be potentially appropriate, but more than a certain amount could be an issue. And what they recommended was that no one should receive more than 90 milligram morphine equivalents in a day. That's what the CDC came up with based on its research and what it -- it had done. Again, as a guideline.

*Id.*

Dr. Rubenstein then explained that alternative treatments should be explored by a physician prior to prescribing opioids. For example, a physician should try

physical therapy, occupational therapy, activity modification, and aqua therapy. *Id.* at 632. Dr. Rubenstein also elaborated on the risks associated with prescribing opioids. He testified that because opioids act as a central nervous system depressant they can lead to adverse consequences. *Id.* at 638-40. And he further explained that, in Arkansas, the Arkansas Chronic Intractable Pain Act defines excessive prescribing of controlled substances as: "The prescribing of excessive amounts of controlled substances to a patient, including the writing of an excessive number of prescriptions, for an addicting or potentially harmful drug to a patient. Excessive is defined as the writing of any prescription in any amount without a detailed medical justification for the prescription documented in the patient record." *Id.* at 643-44. Dr. Rubenstein also testified that the Act defines excessive prescribing as prescribing that exceeds 50 MME. *Id.*

Dr. Rubenstein also opined that based on his review of five of Dr. Parker's patients, Dr. Parker's controlled substance prescriptions, specifically the ones in the Indictment (and others not in the Indictment), had no "basis." *See Id.* at 686. Dr. Rubenstein also charged that Dr. Parker's prescribing did not conform with the requirements set forth in the Arkansas Chronic Intractable Pain Act. *See Id.* at 702-03, adding that Dr. Parker's prescriptions were not "appropriate" nor "legitimate." *See Id.* at 736. Dr. Rubenstein also testified that he, unlike Dr. Parker, does not

prescribe Oxycodone 30 mg because it's only appropriate for end stage cancer, palliative care, and hospice type care. *Id.* at 743.

**B. Dr. Parker's Case-in-Chief.**

Dr. Parker testified during trial and explained that as he continued treating pain patients, he sought continuing education on the management of pain, including him joining the American Academy of Pain Medicine, among other educational programs and professional societies. T. Tr. Vol 2, at 871-75. Dr. Parker also described the protocols that he employed when prescribing controlled substances to patients. *See Id.* at 910-17. Those included new patient protocols, follow-up patient protocols, and chronic pain patient protocols. *Id.* at 917-18. For example, a new patient had to sign a consent agreement, identify where they had been treated previously. *Id.* That's because Dr. Parker did not accept any patients that were not previously treated for chronic pain. *Id.*

Dr. Parker also discussed individual patients, including those in the Indictment, and he explained how he diagnosed them, managed their pain, and the rationale behind his prescribing to them. *See Id.* at 1036-1071. He testified that he used objective measures like imaging and subjective assessments in treating patients. *Id.* Dr. Parker also explained that he believed his prescribing was for a legitimate medical purpose and in the usual course of professional practice. *See Id.* And he commented on the disagreements that he and Dr. Rubenstein had on how a physician

should prescribe in Arkansas. *See Id.* For example, Dr. Parker testified that Dr. Rubenstein "used objective findings in a manner that I am not familiar with, with the regulations here in Arkansas." *Id.* at 1059.

Dr. Wartenberg was also called as part of Dr. Parker's case-in-chief. *Id.* at 1124. He testified on his experience, education and training in addiction. *Id.* at 1124-27. He also explained that he is board-certified in Internal Medicine, and he testified that he has taught the practice and treatment of pain at numerous colleges and helped author a textbook on the same. *See Id.* at 1128-29. The government nonetheless objected to Dr. Wartenberg's testimony, arguing that he did not have sufficient education, experience or training to be qualified as an expert in pain medicine. *Id.* at 1130-1146. The government further complained that defense counsel provided insufficient notice of Dr. Wartenberg's expert testimony, producing a one-page disclosure and report of Dr. Wartenberg's anticipated testimony. *Id.* at 1141-48. That one-page disclosure and report was provided to the government on October 12, 2022, which was one week before the jury trial on October 18, 2022. *See Id.*

The district court found that Dr. Wartenberg was qualified to opine as an expert in addiction but not in pain medicine. *Id.* at 1154-1160. The district court determined, however, that Dr. Wartenberg had to be certified narrowly as an expert *only* in general medicine and addiction medicine in front of the jury so that "the jury

is [not] left thinking he's an expert just like Dr. R[ubenstein]." *Id.* at 1161-63. And that's exactly what happened. *See Id.*

The jury was brought back in and Dr. Wartenberg testified. He explained that in reviewing Dr. Parker's patient medical records and Dr. Rubenstein's report that he believed that Dr. Parker's prescribing to his patients was appropriate and "that care was taken that a reasonable and prudent physician would take in managing pain in those patients." *Id.* at 1163-64. Dr. Wartenberg also opined that Dr. Parker's documentation in his medical records were sufficient and robust because the "records all included a history of present illness, a past medical history, family history, social history, system review, appropriately focused physical examination, laboratory tests as indicated as those records seemed comprehensive and complete." *Id.* Dr. Wartenberg further testified that the physical examinations Dr. Parker gave to patients were related to the nature of the patient's complaint, moving him to conclude that Dr. Parker's prescribing was purposeful and tailored to the specific needs of each patient. *Id.* at 1164-65. And, finally, Dr. Wartenberg also opined that Dr. Parker's treatment of each patient addressed concerns of diversion or misuse of controlled substances. *See Id.* at 1166-67.

Despite all this testimony, Dr. Wartenberg was prevented from opining on the standard of care for prescribing, as Dr. Rubenstein had earlier in the trial:

> Ladies and gentlemen, the witness is not an expert on the
> legal definition of standard of care. What he may be stating

> may be his belief of what the standard of care is, but that
> is -- he is not an expert on the legal standard of care. Okay.

*Id.* at 1175; id at 1178 (preventing Dr. Wartenberg from opining on whether prescriptions were issued outside the usual course of professional practice).

### C. The Jury Verdict and Sentencing.

Dr. Parker was found guilty on Counts 1-4 of the unauthorized distribution of a controlled substance. R. Doc. 169. He was acquitted on Count 5 and the jury also found that his Oxycodone prescription did *not* cause the death of Patient N.C. as alleged in Count 1. *See Id.*

The district court sentenced Dr. Parker to 87 months of imprisonment on Counts 1 and 4 and 12 months of imprisonment on Counts 2 and 3, with all counts to run concurrently. Add. 20-26, R. Doc. 226. That sentence was based on a Converted Drug Weight (CDW) of 873.52 kilograms which represented Dr. Parker's prescriptions issued to the patients in the Indictment. Sent. Tr. at 38-39, 44. The district court rejected Dr. Parker's CDW of 60,460 kilograms, representing a base offense level of 12, which was based on the counts of conviction. *See Id.* at 49-50.

This led to a total base offense level of 28. Moreover, the district court noted "that even if defendant is only held accountable for the type of drugs listed in the counts of conviction that were prescribed during these time period, he would be held accountable for 782.981 kilograms of converted drug weight, which still corresponds to a base offense level of 28." *Id.* at 38-39.

# SUMMARY OF THE ARGUMENT

1. The government at trial sought to prove that Dr. Parker "overprescribed" Oxycodone and Promethazine HCl. It did so by relying on CDC and Arkansas guidelines that purport to establish MMEs that physicians should adhere to when prescribing controlled substances. There was no dispute at trial that Dr. Parker treated patients that suffered from legitimate medical conditions requiring the Oxycodone and Promethazine HCl that he prescribed. But medical disagreement on the strength or quantity that a physician prescribes is not tantamount to drug trafficking. And the Supreme Court in *United States v. Moore*, 423 U.S. 122, 137 (1975) made clear that is what the harsh penalties under Section 841(a) are intended to target. The evidence at trial was thus insufficient to convict Dr. Parker.

2. The district court abused its discretion by failing to identify a fact (or facts) that Dr. Parker ignored a high probability of existing. Because it failed to comply with that requirement, as set forth in *Global-Tech*, 563 U.S. at 769-70, charging deliberate ignorance was improper. The deliberate ignorance charge was further improper because it equated prescribing to addicted patients or patients diverting their medications with drug trafficking, pressing the jury that doing either, or both, was wrong. Reversal is thus appropriate

because the jury was invited to convict Dr. Parker whether or not he satisfied the elements to convict under Section 841(a).

3. The district court abused its discretion because it charged the jury to convict Dr. Parker if he violated Arkansas' standard for prescribing. This was improper because there is no support in case law, or the Controlled Substances Act, that conditions conviction under Section 841(a) based on the individualized standard for prescribing in a given state. Nor is there support in the medical community for using guidelines to convict or punish a physician. The CDC in 2022, for example, issued its guidelines counseling against exactly that.

4. The district court clearly erred in calculating drug weight where it found that Dr. Parker "overprescribed" Oxycodone and Promethazine HCl but did not determine what part of those prescriptions were suitable for his patients' medical needs. The district court further erred because Dr. Parker was not convicted of an offense that comprises of a "course of conduct" or scheme. Instead, drug trafficking under Section 841(a) is limited to the distributed drugs that the jury finds unauthorized.

**ARGUMENT**

## I.    The Evidence is Insufficient to Convict Dr. Parker Because the Government Did Not Prove that he was Drug Trafficking

### A. Standard of Review

When, as here, T. Tr. Vol 1, at 826-848, T. Tr. Vol 2, at 1265, a defendant moves for judgment of acquittal under Rule 29, this Court reviews challenges to the sufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the verdict." *United States v. Lussier*, 844 F.3d 1019, 1023 (8th Cir. 2017). Reversal follows "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id*.

### B.  Every Patient Had a Legitimate Medical Basis for Their Prescriptions

The Controlled Substances Act ("CSA"), in particular 21 U.S.C. § 841(a), was enacted to target drug trafficking. *United States v. Moore*, 423 U.S. 122, 137 (1975) (affirming the harsh penalties for unlawful distribution were deemed by Congress to be an appropriate sanction for drug trafficking by a registered physician). Of course, that drug trafficking must have been undertaken knowingly or intentionally. *Ruan v. United States*, 597 U.S. 450, 468 (2022).

Circuit courts have used 21 C.F.R. § 1306.04(a) to measure when a physician has departed from practicing medicine and instead is trafficking controlled substances. The operative phrase is that: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual

13

practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Because this phrase is ambiguous, susceptible to more precise definition, and open to varying constructions, there is disagreement on whether it may be applied in the disjunctive versus conjunctive. *See* Lubetsky Pet. for Cert., at 22-27 (No. 23-10142), https://www.supremecourt.gov/DocketPDF/24/24-137/321689/20240805175319243_24-%20Petition.pdf.

The case law in this Court is less than clear on the issue, nor has this Court decided a prescribing case following the Supreme Court's decision in *Ruan*.[2] *See United States v. Smith,* 573 F.3d 639, 649 (8th Cir. 2009) (drawing distinction between standard of care in medical malpractice context versus the heightened requirement of prescribing absent a legitimate medical purpose in criminal prosecutions); *compare United States v. Elder,* 682 F.3d 1065, 1068-69 (8th Cir. 2012) (analyzing sufficiency of evidence to convict a physician based on prescribing outside the usual course of professional practice); *but see United States v. King,* 898 F.3d 797, 807 (8th Cir. 2018) (citing to *Smith,* 573 F.3d at 647-49 and suggesting that the conjunctive reading of § 1306.04(a) is appropriate).

---

[2] There does appear to be cases involving the distribution of a controlled substance under Section 841(a). None deal with prescribing, however. *See e.g., United States v. Cardwell,* 71 F.4th 1122, 1124 (8th Cir. 2023).

What is not in dispute is that the government must prove that a physician was drug trafficking to subject them to the harsh penalties under Section 841(a). *Moore*, 423 U.S. at 137. Whether that be proven by prescribing "outside the usual course of professional practice," or prescribing for "other than a legitimate medical purpose," or both. *See* 21 C.F.R. § 1306.04(a).

Drawing this all together, to convict Dr. Parker for drug trafficking under 21 U.S.C. § 841(a)(1) and (b)(1)(C) the government had to prove beyond a reasonable doubt that he "was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, *i.e.* the personal profit of the physician." *Smith*, 573 F.3d at 657 (internal quotation marks and citation omitted).

There, for example, physician prescribing was deemed to be drug trafficking because, *inter alia*, "Dr. Mach placed no limit on the type of drugs that he would prescribe, allowed customers to choose the type and brand of drug that they desired for their self-stated alleged medical conditions, provided no limitations on the quantity of drugs that customers could obtain at one time or within a particular time period, and did not monitor dosage in any way." *Id.* at 657-58. Drug trafficking was also found because "[t]he evidence further indicate[d] that Dr. Mach approved each

order submitted to him, despite the fact that, in at least one instance, the name on the prescription was an obscene word and not a person." *Id.*

By contrast, here, Dr. Parker was convicted of "overprescribing." *See* Sent. Tr. at 38 ("At trial there was evidence that on a nearly monthly basis, defendant overprescribed various controlled substances…"). No one disputes that Dr. Parker was indicted for treating legitimate pain patients. Each patient had a documented chain of treatment for pain, and none were opioid naïve patients. Dr. Parker did not take on patients that were not previously treated for pain. T. Tr. Vol 2, at 917-18.

Dr. Parker's patients were genuinely suffering from pain, and they explored other treatment modalities that had proven ineffective at managing their pain before seeking treatment from Dr. Parker. Patient N.C., for example, had her right pinky amputated and constant complaints of back pain. T. Tr. Vol 1, at 653-54. N.C. struggled with pain for a long time, having lumbar spine surgery two times, and indicating a pain score of ten when treated by Dr. Parker. *Id.* Patient G.T. was suffering from bronchitis and complaining of a pain level of 8 when he sought treatment from Dr. Parker. *Id.* at 723-25. Patient K.J. complained of a chronic cough with a pan level of 8. *Id.* at 732. K.J. was using marijuana during the same time that he suffered from his chronic cough and pain. *Id.* at 733-35. Dr. Parker treated his cough and pain by prescribing Promethzine HCl 420 milliliters. *Id.* Dr. Rubenstein took issue with Dr. Parker treating this patient, claiming that "You don't give another

controlled substance to someone who's already admitting that they're using another controlled substance." *Id.* Patient L.H. had been in a motor vehicle and snowboarding collision. *Id.* at 687-88. Imaging studies showed that L.H. sustained multiple fractures in his lower back and coccyx regions. *Id.* He had previously been treated at the Veteran's Administration and received prescriptions for Hydrocodone and Methadone. *Id.* at 194-95.

According to Dr. Rubenstein, however, doses like Oxycodone 30 mg are only appropriately prescribed for end stage cancer, palliative care, and hospice type care. T. Tr. Vol 1, at 743. Dr. Rubenstein also took a strong view against the doses of Promethzine HCl that Dr. Parker prescribed, commenting that he rarely sees that dose prescribed in practice. *Id.* at 725. It was the strength and quantity of Dr. Parker's prescriptions that Dr. Rubenstein took issue with. *See Id.* at 736. This amounts to a philosophical difference in prescribing, not prescribing for other than a legitimate medical purpose. Or, in other words, not the drug trafficking that 21 U.S.C. § 841(a) was enacted to target. *Moore*, 423 U.S. at 137.

Nor does this case exemplify prescribing "outside the usual course of professional practice." Again, the issue with Dr. Parker's prescribing boils down to the strength and quantities that he prescribed. *See* T. Tr. Vol 1, at 668 (Dr. Rubenstein testifying that the biggest concern is that Dr. Parker's prescriptions were consistently above 90 MME). This is separate and distinct from the decision to prescribe opioids

or controlled substances in the first instance—*i.e.,* whether the patient has a medical condition requiring the same. *Cf. Elder*, 682 F.3d at 1071 (affirming drug trafficking conviction where physician kept no patient files "cast[ing] serious doubt on whether any legitimate doctor-patient relationships existed.").

Accordingly, Dr. Parker respectfully submits that the Court can end its inquiry here and find that the evidence at trial is insufficient to sustain his drug trafficking convictions.

### C. Drug Trafficking Under Section 841(a) Requires Prescribing for Other Than a Legitimate Medical Purpose

Should the Court be inclined to explore this issue further following *Ruan*, Dr. Parker submits that it should hold that the conjunctive reading of Section 1306.04(a) is necessary to convict a physician for drug trafficking. That is, the government must prove that the physician prescribed both "outside the usual course of professional practice" and for "other than a legitimate medical purpose." This reading is required under the rule of lenity given that the phrase defining an authorized prescription is ambiguous and open to varying constructions. *Ruan* 597 U.S. at 459; *see Ladner v. United States,* 358 U.S. 169, 178 (1958) (affirming that ambiguity in criminal statutes should be construed narrowly and in favor of the defendant). Because this case was not about whether Dr. Parker had a legitimate medical purpose in prescribing in the first place, but whether he overprescribed pursuant to Arkansas

and 2016 CDC Guidelines, vis-à-vis MME, that alone is enough to find insufficient evidence to sustain Dr. Paker's convictions.

Accordingly, even if the Court finds sufficient evidence that Dr. Parker prescribed "outside the usual course of professional practice," his convictions should nonetheless be vacated.

## II. The District Court Abused Its Discretion in Giving a Deliberate Ignorance Instruction

### A. Standard of Review

Dr. Parker objected to the deliberate ignorance instruction given to the jury. T. Tr. Vol 2, at 1247-48. This Court reviews the decision to give a jury instruction under the abuse-of-discretion standard. *United States v. Hayes*, 574 F.3d 460, 475 (8th Cir. 2009). The review is guided by viewing the evidence and any reasonable inference from that evidence in the light most favorable to the government. *Id.* While a district court should not give the deliberate-ignorance instruction when the evidence points solely to the defendant's actual knowledge of the facts in question, the instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary. *United States v. Woodard*, 315 F.3d 1000, 1004 (8th Cir. 2003). "In order for a defendant's ignorance to be deliberate or willful, the defendant must have been presented with facts that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to

investigate those facts . . . . " *Id.* (citing *United States v. Barnhart*, 979 F.2d 647, 652 (8th Cir. 1992)).

## B. The District Court Did Not Identify A Particular Fact That Dr. Parker Took Deliberate Action to Avoid Learning

The latest authority from the Supreme Court on deliberate ignorance is *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011). Synthesizing the case law across circuits, the Supreme Court found that: "While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. *Id.* at 770. According to the Court, "these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence." *Id.* (holding "[u]nder this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.").

Here, the district court observed that "I think there could be willful blindness." T. Tr. Vol 2, at 1248. But the district court never explored nor identified which fact, or facts, warranted the deliberate ignorance charge that it provided. *See Id.* at 1245-48. This was an abuse of discretion because under *Global-Tech* the district court had to specifically identify a fact (of facts) that it found (1) defendant subjectively

believed there was a high probability of and (2) that defendant took deliberate action to avoid learning of that fact (or facts). 563 U.S. at 769-770.

### C. The Deliberate Ignorance Charged Pressed the Jury to Convict Dr. Parker Even if He Was Not Drug Trafficking Controlled Substances

The charge that the district court provided to the jury read, in relevant part, as follows:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant believed there was a high probability that… were addicted to oxycodone, and that… were diverting promethazine with codeine cough syrup, and that he took deliberate actions to avoid learning of that fact.

Add. 3, R. Doc. 170, at 18.

Because prescribing opioids is complex and incorporates a great degree of subjective decision-making, there are no discrete categories of "right" versus "wrong." So, for example, a physician may continue to prescribe Oxycodone to a patient that was suffering from addiction or Promethazine to patients diverting the medication. Instead of abandoning the patient, the physician would likely engage with the patient and take rigid protocols to correct the problematic behavior and make sure the behavior does not occur again.

The Supreme Court in *Global-Tech* held that deliberate ignorance is limited in scope. 563 U.S. at 769-770. Under the Court's framework, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability

of wrongdoing and who can almost be said to have actually known the critical facts." *Id.*; *see also United States v. Listman*, 636 F.3d 425, 431 (8th Cir. 2011) ("Ignorance is deliberate if the defendants were presented with facts putting them on notice criminal activity was particularly likely and yet intentionally failed to investigate." (citation omitted)).

Wrongdoing in this case was drug trafficking, *i.e.,* knowingly or intentionally prescribing controlled substances in an unauthorized manner. *See* 21 U.S.C. § 841(a); *Ruan* 597 U.S. at 468. There may be nothing wrong with prescribing Oxycodone to addicted patients or Promethazine to patients diverting the same. That, of course, depends on the measures that a physician is taking to protect against that behavior while prescribing the controlled substance. *See United States v. Arny*, 137 F. Supp. 3d 981, 984 (E.D. Ky. 2015) ("And although doctors can use their intuition and experience to guide them as to when and how much pain medication is appropriate, there is no magic formula.").

Whether Dr. Parker was drug trafficking Oxycodone or Promethazine in violation of Section 841(a)(1) and (b)(1)(C) was a determination that should have been left to the jury. Following evidence and argument the jury may have found that prescribing in the face of addiction and diversion is tantamount to drug trafficking. The jury, however, may decline to make such a finding. The district court abused its discretion by casting complex prescribing decisions into discrete categories of

"right" and "wrong" and then giving a deliberate ignorance instruction that equated prescribing decisions as "wrong" such that it constituted "criminal activity." *Listman*, 636 F.3d at 431.

### D. The Improper Deliberate Ignorance Instruction Impacted the Outcome of Trial.

Dr. Parker must still show that the district court's error in giving the improper deliberate ignorance instruction impacted the outcome of his trial. *See United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir. 1991); *United States v. Dvorak*, 617 F.3d 1017, 1024-25 (8th Cir. 2010) (applying "harmless error analysis . . . to issues of instructional error" (citation omitted)).

Here, the deliberate ignorance instruction impacted the outcome of trial because it equated prescribing Oxycodone to addicted patients and prescribing Promethazine to patients diverting the medication with drug trafficking under 21 U.S.C. § 841(a). For example, the instruction started by pressing that: "You may find that the defendant acted knowingly if you find beyond a reasonable doubt that…". Add. 3, R. Doc. 170, at 18. Further on, the instruction stated: "A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.*

The first part of the instruction pressed the jury that they can find that Dr. Parker acted knowingly but it does not specify to what end. It thus invites the jury

to find that Dr. Parker knowingly prescribed Oxycodone and/or Promethazine in an unauthorized manner (*i.e.,* drug trafficking) solely based on addiction and diversion. And the latter clause of the instruction only further presses the jury in that direction. That's because the district court unequivocally stated that a willfully blind defendant takes deliberate actions to avoid the high probability of *wrongdoing*. Add. 3, R. Doc. 170, at 18. This reinforces that Dr. Parker prescribing in the face of addiction or diversion amounts to wrongdoing under Section 841(a)… Even if he took proactive steps to protect against the same while continuing to prescribe patients their much-needed medications. This was improper and highly prejudicial. *See In re Winship*, 397 U.S. 358, 364 (1972) (per curiam) (affirming due process requires that the government bear the burden of proving all elements of the offense charged beyond a reasonable doubt).

If the jury had been properly instructed it would not have been invited to convict Dr. Parker unless he was drug trafficking. But the jury received that invitation and that colored the way that it weighed and viewed the evidence at trial. This affected the outcome of the trial, providing the government with another, and improper, basis to convict Dr. Parker of drug trafficking.

Accordingly, the Court should reverse Dr. Parker's convictions.

## III. The District Court Abused Its Discretion Charging the Jury to Convict Dr. Parker Based on a State Standard for Prescribing

### A. Standard of Review

This Court reviews jury instructions for abuse of discretion and will affirm the district court if the instructions, as a whole, sufficiently submit the issues to the jury. *United States v. Farish*, 535 F.3d 815, 821 (8th Cir. 2008); *United States v. Hayes*, 518 F.3d 989, 994 (8th Cir. 2008) (affirming that district courts are entitled to broad discretion in formulating jury instructions). But when there is no objection to the instructions in question at trial, the Court reviews for plain error, reversing only if there is clear error that affects substantial rights. *United States v. Farish*, 535 F.3d 815, 821 (8th Cir. 2008).

### B. Dr. Parker's Initial Motion for New Trial Following the 2022 CDC Prescribing Guidelines

During trial the government relied on the 2016 CDC and State Arkansas prescribing guidelines, *i.e.,* Arkansas Chronic Intractable Pain Act, to argue that Dr Parker's overprescribed Oxycodone and Promethazine HCl based on elevated patient MMEs. T. Tr. Vol 1, at 40-60, 632-644.

Then, in charging the jury, the district court instructed that they could find Dr. Parker guilty if the government proved beyond a reasonable doubt that he knowingly or intentionally prescribed without a legitimate medical purpose outside the usual course of professional practice. Add. 1, R. Doc. 170, at 6. The district court went on

to define that phrase, "legitimate medical purpose" and "usual course of professional practice," as: acting in accordance with appropriate criteria for prescribing controlled substances in the State of Arkansas. *Id.* at 7.

Following trial, Dr. Parker's counsel filed a Motion for New Trial on March 3, 2023. R. Doc. 196. There, counsel argued that the newly published 2022 CDC prescribing guidelines, issued one week after Dr. Parker's trial, constituted new evidence that warranted a new trial. *Id.* at 1-2. Specifically, counsel argued that the 2022 CDC Guidelines cautioned against the exact mistake that Arkansas made: converting guidelines into law." *See Id.* Because the government built its case against Dr. Parker with that law (i.e., Arkansas' laws for prescribing), a new trial was warranted. *See Id.* at 5-22.

The district court denied the motion for a new trial. Add. 4-10, R. Doc. 203. On the one hand, the district court found that: "By way of background, the 2016 Guidelines and Arkansas State Medical Board's regulations were not only admitted into evidence, but they were referenced regularly throughout the trial by both parties when discussing the applicable standard of care. They were also referenced in the agreed-upon jury instructions." *Id.* at 4 (citing Add. 2, R. Doc. 170, at 7 (describing "legitimate medical purpose" and "usual course of professional practice" as "acting in accordance with appropriate criteria for prescribing controlled substances in the State of Arkansas")). Still, the Court found that Dr. Parker was not entitled to a new

trial because of the volume of evidence and witness testimony presented at trial. *See Id.* at 6 ("The jury in Defendant's October 2022 trial was presented with a copious amount of evidence and weighed that evidence against the standards of professional practice which were in place during the dates of the crimes charged."). This led the district court to conclude that even if a jury was presented with the 2022 CDC Guidelines, Dr. Parker failed to show that an acquittal would follow. *Id.*

### C. Dr. Parker's Subsequent Motion for New Trial Having Retained Post-Trial Counsel

On June 28, 2023, the district court granted Dr. Parker's motion to substitute counsel. R. Doc. 205. Shortly thereafter and without delay, Dr. Parker filed a subsequent Motion for New Trial on August 10, 2023. R. Doc. 206. In that motion, Dr. Parker argued that Dr. Parker was convicted under a standard that is not found in law. *Id.* at 6-7. Specifically, Dr. Parker argued that there is no support for the district court's charge in Instruction No. 6 pressing the jury to convict Dr. Parker if he violated State law. *Id.* ("This Court incorrectly determined that state prescribing guidelines set the boundaries for a physicians conduct under 21 U.S.C. § 841(a) and instructed the jury in accordance with this view"). Dr. Parker also argued that there was excusable neglect based on trial counsel's ineffectiveness for the untimely filing of his subsequent motion for new trial. *Id.* at 3-6.

The district court denied Dr. Parker's subsequent motion for new trial, finding that he had not satisfied the criteria to demonstrate excusable neglect, especially

because transcripts of the trial proceeding were not yet available. Add. 18, R. Doc. 211, at 8. "Without a fully developed record, the Court finds that Defendant's ineffective-assistance-of-counsel claim is not yet ripe." *Id.* The district court thus did not consider whether or not it abused its discretion in charging the jury to convict Dr. Parker based on a State standard for prescribing. *See Id.*

## D. The Court Should Review Dr. Parker's Challenge for Abuse of Discretion

Following trial, Dr. Parker's counsel realized that the district court erred in pressing the jury to convict Dr. Parker based on State prescribing guidelines. Counsel specifically argued that it was wrong to convict Dr. Parker for him deviating from Arkansas' standard for prescribing because the State made the exact mistake that the 2022 CDC Guidelines cautioned against: converting guidelines into law. R. Doc. 196, at 1-2, 5-22.

Then, in Dr. Parker's subsequent Motion for New Trial, his post-trial counsel specifically argued that given this change in prescribing via the 2022 CDC Guidelines and the Supreme Court's decision in *Ruan*, the district court erred in instructing the jury to convict Dr. Parker if he violated Arkansas' prescribing standards. R. Doc. 205, at 6-7.

Because there was an intervening change that directly impacts how to measure authorized prescribing in criminal prosecutions, together with trial counsel's timely Motion for New Trial immediately following that change and post-trial counsel's

subsequent Motion for New Trial, Dr. Parker submits that the Court should review his challenge for abuse of discretion. *See Joseph v. United States,* 574 U.S. 1038 (2014), *respecting denial of certiorari* (Kagan, J.) (noting that every circuit but the Eleventh [which has since changed its rule] says an appellant preserves an issue, despite not presenting it in his opening brief, when change in precedent makes the previously foreclosed argument available).

Even if reviewed for plain error, Dr. Parker still submits reversal is appropriate given the clear instruction in *Ruan* and other Supreme Court precedent, which is outlined for the Court below.

### E. The District Court's Instruction to Convict Based on State Prescribing Criteria Undermines *Ruan* and the CSA

Following and even before *Ruan*, defining an authorized prescription has proven difficult. The Supreme Court has repeatedly found the phrase that is used to measure authorization "ambiguous" and "open to varying constructions." *Ruan,* 597 U.S. at 459. This ambiguity has resulted in varying interpretations of the scope of permissible conduct required as a physician. And this has resulted in a drastic shift in the availability of pain treatment for pain patients in this country as a relatively risk-adverse population of healthcare providers struggle with shifting and vague limits of conduct. Significantly, there is no support for the proposition that state prescribing criteria should set the limits of conduct for a physician under 21 U.S.C § 841(a).

Beginning with the statute and implementing regulations Title 21 U.S.C. § 841(a) makes no mention of state prescribing criteria and from a textualist approach, Congress has not delegated any authority to the States to set the limits of conduct required under Section 841(a). F. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J. L. & Pub. Pol'y 59, 65 (1988) (The usual textualist enterprise involves "hear[ing] the words as they would sound in the mind of a skilled, objectively reasonable user of words."). Likewise, the implementing regulation 21 C.F.R. § 1306.04(a) states that for a prescription to be valid, it must be issued for a "legitimate medical purpose by a practitioner acting in the usual course of professional practice". 21 C.F.R. § 1306.04(a). The regulation makes no mention of state prescribing guidelines and, indeed, when the regulation was first adopted most states did not even have prescribing guidelines.[3] The notion that a state can have such a broad impact on the application of federal law is foreign to the application of federal criminal statutes.

After the CDC published its guidelines in 2016, several states used its recommendations as a model for their own opioid limitation laws and some adopted

---

[3] E. M. Stone, et. al., *Implementation and Enforcement of State Opioid Prescribing Laws*, Drug Alcohol Depend. (Jun. 11, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7371528/ (noting that state opioid prescribing laws only came into effect primarily in the past decade).

them as black letter law. [4] As of 2019, 39 states enacted laws restricting opioid prescribing, and 14 states imposed statutory limits on the maximum daily dosage of opioids a provider can prescribe. *Id.* at 1823-24. From 2016 through 2018 the federal and state opioid-related policies totaled five hundred 527, with 171 of those policies imposing opioid prescribing limits. *Id.* According to the CDC and Human Rights Watch, 46 states established guidelines, laws, or policies aligned with the CDC's recommendations in the CDC Guideline. Violation of these policies and regulations is confined by statute to State disciplinary action that could involve a fine, reprimand, suspension, or revocation. This, of course, is disavowed by the CDC following its 2022 Guidelines. *Supra* at 25-27.

The district court's charge that a state board, committee, or sub-committee has the power to influence the interpretation of the law, and thereby alter the conduct required by Congress or the DEA, ignores the absence of any indication from Congress that a violation of 21 U.S.C. § 841(a)(1) is contingent on state law. There is no mention of state prescribing rules in the statute, regulation, or any of the myriad of documents one can parse through to understand Congress' intent. Nor does this

---

[4] Allison Petersen et al., *State Legislative Responses to the Opioid Crisis: Leading Examples*, 11 J. HEALTH & LIFE SCI. L. 30, 35-40 (2018); Noah, *supra* note 101, at 646 ("The CDC's effort appears to have had an impact, in part thanks to state decisions to codify parts of these guidelines.").

appear in the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 which further restricted the phrase "legitimate medical purpose."[5]

Pre-*Ruan* jury instructions, even dating back to the seminal case, *United States v. Moore*, do not contain any reference to prescribing standards: "a physician, who knowingly or intentionally, did dispense or distribute [a controlled substance] by prescription, did so other than in good faith…in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States". 423 U.S. at 138-39 (emphasis added)

The election of a national standard is important here. Even the Supreme Court in *Moore* recognized that it would be inappropriate to hang such a weighty federal law with such harsh punishment on factors created by state boards and only intended for administrative sanctions. *See Id.* at 136-37.

The next time the Supreme Court addressed this issue was in *Gonzales v. Oregon*, where the Court noted that it had never considered, "the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug

---

[5] When Congress amended the CSA to account for both mail order and internet prescribing in recent decades, it included new statutory provisions that include "legitimate medical purpose" in the definition of a valid prescription. For mail-order prescriptions, a valid prescription is "issued for a legitimate medical purpose by an individual practitioner licensed by law to administer and prescribe the drugs concerned and acting in the usual course of the practitioner's professional practice." 21 U.S.C. § 830(b)(3)(A)(ii) (2000). For internet prescriptions, among other things, a valid prescription is one "issued for a legitimate medical purpose in the usual course of professional practice." 21 U.S.C. § 829(e)(2)(A) (2008)

pusher instead of a physician." 546 U.S. 243, 261-62 (2006). Are we to say that any physician who violates any state prescribing regulation even if they do so unintentionally is acting as a drug pusher?

After *Moore* and *Gonzales* most courts allowed some type of good-faith defense for prescribers to try to protect against this notion. The First Circuit, Seventh Circuit, and Ninth Circuit adopted a subjective good faith defense standard. *United States v. Sabean*, 885 F.3d 27 (1st Cir. 2018); *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009); *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006). Since *Ruan*, those instructions have gone away and what we have seen in their place is adherence to a state standard with no good faith exception. This case is a perfect example of that.

And now we get to *Ruan v. United States*. Although interpretation of the phrase "as authorized" was not on the menu for the Court, it did come up in oral argument by a Justice in the majority:

> **Justice Gorsuch**: Just assume hypothetically [that the government brings a case against a doctor where their behavior is a close call] and that the jury believes that it's not legitimate medical purpose under your regulations. Even though it's an extremely close case, that individual stands, under the government's view, unable to shield himself behind any *mens rea* requirement and is subject to essentially a regulatory crime encompassing 20 years to maybe life in prison.
>
> **Mr. Feigin**: Well, Your Honor, I think I think it's –

> **Justice Gorsuch**: I think the answer has to be yes, isn't it?
>
> **Mr. Feigin**: Your Honor, I think the answer is going to be yes.

Tr. of Oral Arg., *supra* n.4, at 71-72.

Justice Gorsuch found it absurd that a physician could be convicted of a regulatory crime encompassing 20 years to "maybe life" in prison.

And in the opinion authored by Justice Breyer, the court did not define "as authorized" as adherence to any particular state regulation. The notion of a strict liability standard requiring a physician to treat within the "standard of care" or risk the weighty punishment that federal controlled substance statutes afford was never discussed and is not included in the opinion. In fact, evidence points the other way.

> In addition, the regulatory language defining an authorized prescription is, we have said, "ambiguous," written in "generalit[ies], susceptible to more precise definition and open to varying constructions. The conduct prohibited by such language (issuing invalid prescriptions) is thus "often difficult to distinguish from the gray zone of socially acceptable . . . conduct. A strong scienter requirement helps to diminish the risk of "overdeterrence," i.e., punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line.

*Ruan*, 597 U.S. at 459 (citations omitted).

If the phrase in question was capable of a precise definition and specifically aligned with a state prescribing regulation then the Supreme Court would not have specifically discussed the ambiguous nature of the regulation. *Ruan*, 597 U.S. at 459.

34

An ambiguous regulation cannot be made unambiguous by an interpretation solely found in state law and it certainly cannot be made unambiguous by adhering to prescribing standards that widely differ among the states.

The Supreme Court puts the nail in the "state standard" coffin with the following passage:

> Finally, the Government argues that requiring it to prove that a doctor knowingly or intentionally acted not as authorized will allow bad-apple doctors to escape liability by claiming idiosyncratic views about their prescribing authority.
>
> ***
>
> The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. And the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as "legitimate medical purpose" and "usual course" of "professional practice". As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge." But the Government must still carry this burden. And for purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his or her conduct was unauthorized.

*Id*. at 467 (citations omitted).

It's important to note that knowledge can be proven by "circumstantial evidence." The Court did not say it can be proven by direct evidence of a state standard. The only way to read this passage is that the government must establish what the standard is—by way of expert testimony—regarding what a reasonable

physician would do, and the more unreasonable the defendant's actions are the more likely he/she is to be convicted. A conviction can be found in the distance between the defendant's actions and the applicable standard. Inserting a state standard in the jury instructions creates a strict liability standard essentially permitting conviction based on prescribing criteria that do not place a Defendant's actions into the category of "unreasonable".

In a state where a 100 MME is the high bar for prescribing – is a prescription of 110 MME criminal? No, of course not.

The severity of the deviation is for the state medical board to determine. They can take no action at all, send a letter, a reprimand, or require re-education. That is much different than saying that a state standard paves the way for an *ipso facto* federal drug trafficking conviction.

Accordingly, it was improper for the district court to instruct the jury to convict Dr. Parker if he violated Arkansas' standards for prescribing. This allowed the government to convict Dr. Parker on an improper basis. *See In re Winship*, 397 U.S. at 364 (affirming due process requires that the government bear the burden of proving all elements of the offense charged beyond a reasonable doubt). And, in fact, the jury did. *See* Add. 7, R. Doc. 203, at 4 ("By way of background, the 2016 Guidelines and Arkansas State Medical Board's regulations were not only admitted into evidence, but they were referenced regularly throughout the trial by both parties

when discussing the applicable standard of care. They were also referenced in the agreed-upon jury instructions."). This requires reversal. *See e.g., United States v. Kahn*, 58 F.4th 1308, 1319 (10th Cir. 2023) (finding it improper to reweigh the evidence on appeal and opine on what verdict a properly instructed jury would have reached).

The Court should thus reverse Dr. Parker's convictions.

## IV. The District Court Clearly Erred in Calculating Drug Weight Because it Failed to Identify What Portion of "Overprescribed" Prescriptions were Legitimate and Improperly Used "Course of Conduct" to Balloon Drug Weight

### A. Standard of Review

This Court reviews the district court's determination of drug quantity under a clearly erroneous standard. *United States v. Bieri*, 21 F.3d 811, 814 (8th Cir. 1994). Reversal follows only where the entire record definitely and firmly convinces the Court that a mistake has been made. *United States v. Simmons*, 964 F.2d 763, 773 (8th Cir.), *cert. denied*, 113 S. Ct. 632 (1992).

The district court may "consider any evidence in its sentencing as long as it has 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Behler*, 14 F.3d 1264, 1273 (8th Cir. 1994) (quoting U.S.S.G. § 6A1.3(a)); *see also King,* 898 F.3d at 809 (holding that drug quantity is a factual finding and that findings of fact are reviewed for clear error applying the preponderance-of-the-evidence standard); *Id.* ("The district court's factual determinations will stand unless the

decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." (internal quotation marks and citations omitted)).

## B. The District Court Found that Dr. Parker Overprescribed Controlled Substances

During sentencing the district court found it clear that: "At trial there was evidence that on a nearly monthly basis, defendant overprescribed various controlled substances…". Sent. Tr. at 38. Because of this, the district court found that all Dr. Parker's prescriptions in the PDMP data at trial constituted the same course of conduct and it calculated a CDW that treated all prescriptions in the PDMP data presented at trial as unauthorized. *Id.* at 22, 37-38, 44; *Cf. King*, 898 F.3d at 809 (finding that in a drug trafficking conspiracy case that district court could calculate drug weight involving drug deals that were part of the same course of conduct or scheme).

This led to a CDW of 873.52 kilograms. That totaled a base offense level of 28. The district court also noted "that even if defendant is only held accountable for the type of drugs listed in the counts of conviction that were prescribed during these time period, he would be held accountable for 782.981 kilograms of converted drug weight, which still corresponds to a base offense level of 28." Sent. Tr. at 38-39. The district court thus rejected Dr. Parker's CDW of 60,460 kilograms, representing a

base offense level of 12, which was based on the counts of conviction. *See Id.* at 49-50.

By the district court finding that Dr. Parker "overprescribed" to the indicted patients, it recognized that at least part of his prescriptions were medically appropriate. Indeed, this case boiled down to Dr. Rubenstein's critique of the MMEs that Dr. Parker prescribed and Dr. Rubenstein's wholesale rejection of prescribing Oxycodone 30 mg to treat and manage intractable pain. T. Tr. Vol 1, at 725-36, 743. At no point during sentencing, however, did the district court determine what portion of Dr. Parker's prescriptions to the indicted patients were medically appropriate and thus authorized under the CSA.

### C. The Court Should Remand so that the District Court can Determine what Part of Dr. Parker's Prescriptions were Legitimate

Because the trial evidence, according to the district court, established that Dr. Parker "overprescribed" controlled substances to the indicted patients in strengths and quantities that did not reflect their condition nor complaints, this Court should remand so that the district court can determine what part of the strengths and quantities prescribed were responsive and medically suitable. *Cf. United States v. Browne*, 89 F.4th 662, 665-66 (8th Cir. 2023) (finding that district court did not clearly err in calculating drug weight where witness testimony credibly supported the drug weight).

## D. The Court Should Remand Because Dr. Parker was not Convicted of an Offense that Comprises of a Course of Conduct or Scheme

In *King*, a recruiter that solicited patients to seeks drugs at a medical clinic was convicted of drug trafficking and conspiracy to commit the same under 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), and 846. *See* 898 F.3d at 802-03. This Court found that the district court did not clearly err in holding the recruiter responsible for both the "number of pills directly attributable to [her], as well as pills from other transactions by the pill mill." *Id.* at 809. This was because the district court was permitted to consider controlled substances that were part of the same course of conduct or scheme. *Id.*

Here, Dr. Parker was convicted only on the substantive counts for drug trafficking under Section 841(a)(1) and (b)(1)(C). He was not convicted of an offense that involved a scheme or course of conduct, for example, a drug trafficking conspiracy. Dr. Parker emphasized this to the district court. *See* Sent. Tr. at 22-29 ("But 841 is not a scheme offense. It's not a conspiracy offense."). Accordingly, unlike in *King,* there was no basis to draw from outside the guilty counts and calculate a drug weight that held Dr. Parker responsible for all of the prescription contained in the PDMP presented during trial. The district court instead should have used the CDW that Dr. Parker proposed, 60,460 kilograms, which was limited to the drugs in the counts of conviction. Sent. Tr. at 49-50.

Accordingly, the district court clearly erred in calculating drug weight and the Court should remand for resentencing.

## CONCLUSION

For these reasons, the Court should reverse Dr. Parker's drug trafficking convictions. Alternatively, the Court should remand for resentencing so that the district court can recalculate CDW.

Respectfully Submitted,

s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq. LL.M
MI Bar No. P73179
1441 W. Long Lake Rd., Ste. 310
T: (248) 644-6326
F: (248) 644-6324
RWChapman@Chapmanlawgroup.com

*Attorney for Defendant-Appellant*
*Lonnie Parker, M.D.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,655 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

Dated: December 9, 2024

*s/ Ronald W. Chapman II*
Ronald W. Chapman II, Esq. LL.M
Attorney for Appellant

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 9, 2024, an electronic copy of the Brief of Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 9, 2024, an electronic copy of the Brief of Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.